1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| 10    JOHN TAM, et al., | CASE NO. C11-2128JLR |
| 11                        Plaintiffs, | ORDER GRANTING MOTION TO DISMISS |
| 12                 v. | |
| 13    UNITED STATES OF AMERICA, | |
| 14                        Defendant. | |

15

## I.    INTRODUCTION

16     Before the court is Defendant United States of America's ("the Government")

17 motion to dismiss Plaintiffs John Tam and Tamami Okauchi's claim under the Federal

18 Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, for lack of subject matter jurisdiction

19 pursuant to Federal Rule of Civil Procedure 12(b)(1).  (Mot. (Dkt. # 11).)  Plaintiffs'

20 claim arises from the death of their daughter, G.T., near the Big Four Ice Caves ("the ice

21 caves") in the Mt. Baker-Snoqualmie National Forest.  (Compl. (Dkt. # 1).)  Having

22 considered the submissions of the parties, the record, and the relevant law, and having

1 │ heard oral argument, the court GRANTS the Government's motion (Dkt. # 11) and

2 │ DISMISSES WITH PREJUDICE Plaintiffs' action pursuant to Rule 12(b)(1).

3 │ <center>II.   BACKGROUND</center>

4 │ **A. The Big Four Ice Caves**

5 │       The Mt. Baker-Snoqualmie National Forest is among the most popular National

6 │ Forests in the country with over five million visitors each year. (Compl. ¶ 4.5.) The

7 │ forest is home to a recreational area known as the Big Four Ice Caves. (*Id.*) The

8 │ Darrington Ranger District of the United States Forest Service ("USFS") is responsible

9 │ for managing the ice caves and the surrounding area. (Forbes Decl. (Dkt. # 12) at 1.)

10 │ The ice caves are situated at the bottom of Big Four Mountain in the midst of a large

11 │ accumulation of avalanche snow at the Mountain's base. (Compl. ¶ 4.14.) The caves are

12 │ formed each year after the winter months as the temperature increases and water runoff

13 │ from melting snow creates exposed caverns in the snow. (*Id.*) Other than the "Big Four"

14 │ caves, adjacent and typically smaller ice caves, known by the USFS as "satellite caves,"

15 │ also form. (Heywood Decl. (Dkt. # 16) at 5.) The ice caves receive thousands of visitors

16 │ each year (with the number of visits peaking in the late summer) and are the most popular

17 │ tourist destination in the Mt. Baker-Snoqualmie National Forest. (Forbes Decl. at 2.)

18 │       To view the ice caves, visitors park at a trailhead, pay a fee, and then hike a short

19 │ distance along USFS Trail #723, a well-maintained and easily walkable footpath.

20 │ (Compl. ¶¶ 4.6, 4.11.) After approximately one mile, Trail #723 ends and visitors can see

21 │ the ice caves from a 40 square foot area enclosed by a low rock wall. (McCormick Decl.

22 │ (Dkt # 19) Ex. 1 at 3.) In addition to the maintained trail, however, there are numerous

1  unmaintained but well-established paths that lead from the viewing area to the ice caves.

2  (Heywood Decl. at 6.)  These unmaintained paths "have developed as visitors desired to

3  get closer to the base of the mountains and access a set of satellite caves to the west of the

4  main caves." (McCormick Decl. Ex. 1 at 3.)

5         Although popular, the ice caves can be dangerous.  (Compl. ¶ 4.15; Forbes Decl.

6  at 4.)  In 1998, for example, one person was killed and another seriously injured when an

7  ice cave collapsed.  (Forbes Decl. at 4.)  The danger of collapse is especially acute in the

8  warmer summer months because the snow and ice that form the caves melts faster as the

9  temperature increases.  (Compl. ¶ 4.17.)  In addition to the possibility of collapse, the ice

10 caves are the site of frequent avalanches that are known to occur throughout the winter

11 and into early spring.  (*Id.*)

12        The USFS is aware that the ice caves are dangerous and has endeavored to warn

13 hikers of this fact.  (*Id.* ¶ 4.18.)  To address the dangers of collapse and avalanche, the

14 USFS uses warning signs to discourage visitors from entering into or climbing upon the

15 ice caves.  (Forbes Decl. 2-4.)  A warning notice on a kiosk at the ice caves trailhead

16 reads:

17        **DANGER!**  The caves are extremely unstable!  DO NOT enter or climb on
          them.  On August 2, 1998, one death and a serious injury occurred due to
18        the ice caves collapsing.  You have a responsibility for yourself and your
          loved ones.
19
    (*Id.* at 4.)  The trailhead kiosk also states:
20
          **CAUTION!  KNOW THE FACTS**
21        • Tumbling avalanches are a constant threat through winter and early
            spring.
22        • Avalanche debris piles accumulate and form a glacier-like surface.

ORDER- 3

- Do not cross the icy debris piles as they can hold dangers such as deep holes and crevasses.
- Tons of ice from the ceilings may come crashing to the floor at any time.
- Observe the ice caves from a safe distance.
- Do Not Enter The Caves.

(*Id.* at 3.)  In addition to the warnings posted on the trailhead kiosk, there is typically another sign located alongside Trail #723 on the walk to the ice caves viewing area that says:

> **ENTERING AVALANCHE ZONE**
> BECAUSE THE CAVES ARE FORMED BY THE CONTINUAL PROCESS OF AVALANCHES AND MELTING ICE, THEY ARE EXTREMELY DANGEROUS TO ENTER AND CLIMB UPON. VISITORS ARE ENCOURAGED NOT TO DO SO.

(*Id.* at 4.)  Although the USFS previously maintained a similar warning sign staked in the ground directly in front of the ice caves, it discontinued this practice out of concern that visitors would venture off the trail to read it and, in doing so, come within an unsafe distance of the base of the mountain.  (McCormick Decl. Ex. 4 ("Forbes Dep.") at 15.)

## B. Ice Cave Collapse

On Saturday, July 31, 2010, Plaintiffs brought their children to visit the ice caves; on the trip were 11-year-old G.T., 9-year-old William, and two foreign exchange students.  (Compl. ¶ 4.1.)  After hiking along Trail #723 and arriving at the ice caves viewing area, the family decided to use one of the user-made trails in order to get a closer view of the caves.  (*Id.* ¶ 4.31.)  The family believed the user-made trails were safe, and that they were developed and maintained by the USFS.  (Tam Decl. (Dkt. # 15) at 3.) Having left the viewing area and hiked up one of the trails, Ms. Okauchi, G.T., William,

1    and the two exchange students posed for a picture on a rock directly in front of the ice

2    caves. (*Id.* ¶ 4.32-33; Reply (Dkt. # 20) Ex. B.) As Mr. Tam prepared his camera, a

3    massive section of ice broke away from the top of the ice cave behind Ms. Okauchi and

4    the children. (Compl. ¶ 4.33.) The ice boulder crashed into the ground and, as it began

5    to roll down the base of the mountain, struck G.T., knocking her off the rock and

6    crushing her body. (*Id.*) G.T. survived the initial impact but died approximately one

7    hour later. (*Id.* ¶¶ 4.34-43.)

8           On the day that G.T. died, the warning sign normally located along Trail #723 on

9    the way to the ice caves viewing area was missing. (*See id.* ¶ 4.47; Forbes Decl. at 6.) In

10   his declaration, Mr. Tam stated: "Had this sign been present, we would have kept a

11   greater distance from the snow fields." (Tam Decl. at 4.) According to Peter Forbes, a

12   ranger assigned to the area, the USFS became aware that the sign was missing on June

13   30, 2010 when an employee discovered its absence. (Forbes Decl. at 6.) The week

14   afterward, USFS employees returned to the area and tried to find the missing sign but

15   were unsuccessful. (*Id.*)

16          The record contains conflicting accounts of when the USFS ordered a replacement

17   sign. According to Mr. Forbes, the USFS ordered a replacement sign on July 15, 2010

18   (*id.*); according to USFS employee, Adrienne Hall, she called and ordered a replacement

19   sign on July 12, 2010 (Mot. to Supp. (Dkt. # 29) Ex. A at 5). An invoice from the sign

20   manufacturer, however, indicates that the order was received on July 26, 2010.

21   (McCormick Decl. Ex. 19.) In any event, it is undisputed that the replacement sign

22   arrived on the afternoon of Friday, July 30, 2010. (Forbes Decl. at 6.) However, the

ORDER- 5

1  USFS elected not to install the sign that day.  (*Id.* at 7.)  Mr. Forbes acknowledges that

2  "signage is one of the things that we realize is critically important" and that "as soon as

3  we're . . . aware that the signs are missing we replace them."  (Tam Decl. Ex. A at 6.)  He

4  explains, however, that:

> The FS did not have staff available to install the replacement sign over the busy summer weekend.  FS officials must budget staffing and assign duties based on available resources.  During the weekends, there are fewer FS staff and they are primarily focused on being out on the trails and other recreation sites.  They are primarily dedicated to handling issues that arise with the public and responding to calls.  Routine maintenance is not generally a priority on weekends.  Rather, staff begins working on [sic] at the beginning of the week to clean up after the weekend and to prepare the sites for the next weekend.

10  (Forbes Decl. at 7.)  The USFS installed the sign on Monday, August 2, 2010, two days

11  after G.T. was killed.  *See id.*

12  **C. Procedural History**

13      Plaintiffs filed a complaint under the FTCA for personal injuries and wrongful

14  death against the Government on December 20, 2011.  (*See* Compl.)  In the complaint

15  they allege that G.T.'s death and her parents' resulting psychological trauma were caused

16  by carelessness and negligence on the part of the USFS in its failure to exercise

17  reasonable care in maintaining the ice caves recreational area, discovering dangerous

18  conditions, neglecting to repost warning signs, and failing to follow its own policies and

19  procedures regarding visitor safety.  (*Id.* ¶ 5.2.)  The Government now moves to dismiss

20  the case for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), arguing that, as

21  sovereign, it is immune from Plaintiffs' claims under the discretionary function exception

22  to the FTCA.  (*See* Mot.)

ORDER- 6

1

### III.   ANALYSIS

2        This question comes before the court on the Government's Rule 12(b)(1) motion

3   to dismiss.  Under Rule 12(b)(1), the court must dismiss claims over which the court

4   lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A Rule 12(b)(1)

5   jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d

6   1035, 1039 (9th Cir. 2004).  A factual attack is one in which "the challenger disputes the

7   truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."

8   *Id.* This motion raises a factual attack.  "In resolving a factual attack on jurisdiction, the

9   district court may review evidence beyond the complaint without converting the motion

10  to dismiss into a motion for summary judgment." *Id.*  If the moving party brings a factual

11  attack on jurisdiction "by presenting affidavits or other evidence properly brought before

12  the court, the party opposing the motion must furnish affidavits or other evidence

13  necessary to satisfy its burden of establishing subject matter jurisdiction." *Wolfe v.*

14  *Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (internal citations and quotation marks

15  omitted).  In this context, the court "need not presume the truthfulness of the plaintiffs'

16  allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Nevertheless, where

17  declarations from the opposing parties contain conflicting versions of facts, the court

18  must resolve the conflict in favor of the plaintiff. *Rhoades v. Avon Products, Inc.*, 504

19  F.3d 1151, 1160 (9th Cir. 2007).

20        The central question in this case is whether the Government has sovereign

21  immunity against Plaintiffs' tort claim pursuant to the discretionary function exception of

22  the FTCA.  "The question whether the United States has waived its sovereign immunity

ORDER- 7

1 against suits for damages is, in the first instance, a question of subject matter

2 jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

3 **A.      Sovereign Immunity and the FTCA As a Waiver**

4        Under the principle of sovereign immunity, the United States cannot be sued for

5 damages without its consent. *See Gray v. Bell*, 712 F.2d 490, 507 (D.C. Cir. 1983), *cert*

6 *denied*, 465 U.S. 1100 (1984).  This principle dates back to the English Common Law

7 and the idea that "the king can do no wrong." *Id.* at 510.  In recent years, changing views

8 of government have led to more and more sovereigns waiving their immunity and, for

9 various reasons, consenting to be sued under limited circumstances. *See id.*

10 Nevertheless, the general rule is that a sovereign is immune unless it waives its immunity.

11 *Id.*  Not only is this rule grounded in a long-established common law tradition, it is also

12 justified by modern policy considerations:

13        The modern policy basis justifying sovereign immunity from suit has three
         principal themes.  First, and most important, on traditional principles of
14       separation of powers, courts should refrain from reviewing or judging the
         propriety of the policymaking acts of coordinate branches.   Second,
15       consistent with the related doctrine of official immunity, courts should not
         subject the sovereign to liability where doing so would inhibit vigorous
16       decision making by government policymakers.   Third, in the interest of
         preserving public revenues and property, courts should be wary of creating
17       huge and unpredictable governmental liabilities by exposing the sovereign
         to damage claims for broad policy decisions that necessarily impact large
18       numbers of people.

19 *Id.* at 511.  Thus, sovereign immunity is grounded in our basic understanding of

20 government and the idea that government cannot possibly protect all of its citizens from

21 harm in all circumstances, nor does it have a duty to do so.

22

ORDER- 8

1   The FTCA is a partial waiver of the United States' sovereign immunity. "The

2   FTCA waives the [United States'] sovereign immunity for tort claims arising out of

3   negligent conduct of government employees acting within the scope of their

4   employment." *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). Under the

5   FTCA, the government can be sued in "circumstances where the United States, if a

6   private person, would be liable to the claimant in accordance with the law of the place

7   where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Nevertheless, the FTCA is

8   not a complete waiver of sovereign immunity; it has limits.

9   **B.     The Discretionary Function Exception to the Federal Tort Claims Act**

10   One of these limits is the FTCA's so-called "discretionary function exception."

11   *Terbush*, 516 F.3d at 1129. The discretionary function exception retains sovereign

12   immunity against "[a]ny claim based upon . . . the exercise or performance or the failure

13   to exercise or perform a discretionary function or duty on the part of a federal agency or

14   an employee of the Government, whether or not the discretion involved be abused." 28

15   U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to

16   impose tort liability upon the United States and its desire to protect certain governmental

17   activities from exposure to suit by private individuals." *Berkovitz by Berkovitz v. United*

18   *States*, 486 U.S. 531, 536 (1988). "The purpose of the discretionary function exception is

19   to protect the ability of the government to proceed with decisionmaking in carrying out

20   its unique and vital functions without 'second-guessing' by the courts as to the

21   appropriateness of its policy choices." *Faber v. United States,* 56 F.3d 1122, 1124 (9th

22   Cir. 1995) (quoting H.R. Rep. No. 1015, 101st Cong. 2nd Sess.). In creating the

1  exception, Congress meant "to protect the Government from liability that would seriously

2  handicap efficient government operations." *United States v. Varig Airlines*, 467 U.S.

3  797, 814 (1984) (internal citation and quotation marks omitted).  The exception merely

4  recognizes the undisputable fact that any governmental policy decision has the potential

5  to harm citizens, but government should nevertheless be allowed to continue operating.

6       Courts use a two-step test to decide whether the discretionary function exception

7  immunizes the government from a tort claim. *Bailey v. United States*, 623 F.3d 855, 860

8  (9th Cir. 2010), *cert. denied*, 132 S. Ct. 814 (2011).  "The first step is to determine

9  whether a federal statute, regulation, or policy mandated a specific course of action, or

10  whether the government actor retained an element of judgment or choice with respect to

11  carrying out the challenged action [or omission]." *Id.*  "The inquiry ends if there is such

12  a statute or policy directing mandatory and specific action because there can be no

13  element of discretion where an employee has no rightful option but to adhere to the

14  directive." *Chadd v. United States*, No. 11-5894 RJB, 2012 WL 3578660, at *7 (W.D.

15  Wash. Aug. 20, 2012) (internal citation and quotation marks omitted).  If the challenged

16  action or omission "did involve choice or judgment, the second step is to determine

17  whether that judgment is of the kind that the discretionary function exception was

18  designed to shield, namely, only governmental actions and decisions based on

19  considerations of public policy." *Bailey*, 623 F.3d at 860 (internal citation and quotation

20  marks omitted).  Under the second step, "[o]nly discretionary decisions that are

21  susceptible to public policy analysis confer immunity on the government . . . ." *Id.* at

22  861.  "If the challenged action or omission satisfies these two prongs, the government is

1   immune from suit based on that action or omission—and federal courts lack subject

2   matter jurisdiction—even if that action or omission constituted an abuse of discretion or

3   was a wrong choice under the circumstances." *Id.* at 860. The Government bears the

4   burden of proving that the discretionary function exception applies. *Prescott v. United*

5   *States*, 973 F.2d 696, 702 (9th Cir. 1992).

6        In its motion to dismiss, the Government argues that the discretionary function

7   exception to the FTCA immunizes the United States against Plaintiffs' lawsuit. (*See*

8   *generally* Mot.) With respect to step one, the Government argues that no federal statute

9   or other directive mandated the USFS to promote visitor safety in a certain manner, or to

10  install the replacement warning sign before G.T. was killed on July 31, 2010. (*Id.* at 5.)

11  Thus, it concludes, the USFS retained a discretionary element of judgment or choice in

12  the matter. (*Id.* at 13.) With respect to step two, the Government contends that because

13  the USFS's discretion was susceptible to policy analysis, it was of the type meant to be

14  protected by the discretionary function exception. (*Id.*) According to the Government,

15  the decision of how many warning signs to post and where to post them requires

16  weighing policy concerns such as maximizing visitor access, preserving natural

17  resources, and protecting visitors from an unlimited range of potential hazards. (*Id.* at

18  13-18.) Further, the Government continues, the decision not to install the replacement

19  before the day that G.T. was killed involved balancing competing policy concerns

20  regarding cost management, forest maintenance, and staffing. (*Id.* at 18-21.)

21

22

1. Step One: Whether a Federal Statute, Regulation, or Policy Mandated a Specific Course of Action

The Government's argument with respect to step one of the discretionary function test is twofold. First, the Government argues that although the USFS was responsible for promoting the safety of its visitors, there was no mandatory directive prescribing a specific course of action to achieve this objective. (Mot. at 5.) Second, the Government argues that no mandatory directive prevented the USFS from declining to install the replacement warning sign before G.T. was killed. (*Id.* at 12.)

The principle federal statutes governing the administration of the USFS are 16 U.S.C. §§ 528, 529, and 531. These statutes do not contain any specific directives regarding public safety. *See id.* Instead, federal regulations provide that the "[a]dministrative policy, procedure, and guidance to Forest Service employees for the conduct of Forest Service activities are issued as directives" to the Chief of the Forest Service and designated field officers. 36 C.F.R. § 200.4(b). These directives are issued through the Forest Service Directive System in the Forest Service Manual ("FSM") and related handbooks. 36 C.F.R. § 200.4(b)(1).

Section 2332 of the FSM applies to the "Operation and Maintenance" procedures of recreation areas; this section contains a provision entitled "Public Safety":

**2332 – OPERATION AND MAINTENANCE**

Prepare and annually update an operation and maintenance plan for recreation sites. A separate plan may be prepared for a single site or group of sites or the plan may cover an entire range or district.

Give health and safety related items highest priority.

**2332.1 - Public Safety**

To the extent practicable, eliminate safety hazards from developed recreation sites. Inspect each public recreation site annually before the beginning of the managed-use season. Maintain a record of the inspections and corrective actions taken with a copy of the operation and maintenance plan.

Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.

FSM 2332, 2332.1; (Mot. Ex. A at 22-23).

As made clear by these provisions, the USFS is required "[t]o the extent practicable, [to] eliminate safety hazards from developed recreation sites." FSM 2332.1; (*see* Mot. Ex. A at 23). In doing so, the USFS must "[i]mmediately correct high-priority hazards that develop or are identified during the operating season or close the site." *Id.* Although the FSM does not explicitly define "high-priority hazards," Section 2332's umbrella provision is instructive: "Give health- and safety-related items highest priority." FSM 2332; (*see* Mot. Ex. A at 22). Further, FSM 2332.12 provides that to protect visitors from known natural hazards, the USFS should "[c]onsider posting signs, installing barriers, or, if necessary, closing the site to address concerns of public safety." FSM 2332.12; (*see* Mot. Ex. A at 23).

The FSM did not mandate the USFS to install extra signs or other additional safety measures in the ice caves area. First, Plaintiffs are incorrect in arguing that the FSM provision regarding sign postings "required" the USFS to post signs at the ice caves viewing area. (Resp. at 8.) FSM 2332.12 only requires the USFS to "consider posting signs"—this language is plainly discretionary. The decision of how best to warn visitors

ORDER- 13

1  of safety hazards is "precisely the kind [of decision] the discretionary function exception

2  was intended to immunize from suit." *Terbush*, 516 F.3d at 1135.  Second, the USFS

3  was only responsible for eliminating safety hazards "to the extent practicable"—this

4  language is also plainly discretionary.  Courts have understood the decision about how to

5  best protect visitors while simultaneously preserving the wilderness as requiring

6  significant discretion on the part of the Government because it involves effectively

7  allocating costs, promoting access, and other policy concerns.  *See, e.g., Valdez v. United*

8  *States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (understanding the mandate to warn public of

9  "special hazards" as necessitating discretion because "a degree of judgment is required in

10  order to determine which hazards require an explicit warning and which hazards speak

11  for themselves"); *Childers v. United States*, 40 F.3d 973, 975 (9th Cir. 1994) (holding

12  that the government retained discretion with respect to wilderness trail design because it

13  required the balancing of policy concerns).  The essence of this is that the USFS is

14  responsible for deploying limited resources to protect the public from a virtually limitless

15  number of potential hazards.

16        This is not a case where the Government utterly failed to implement safety

17  measures to protect the public from a known hazard.  For example, these facts are unlike

18  those in *Faber v. United States*, where the USFS became aware that visitors were

19  experiencing a significant number of injuries associated with diving off of a waterfall, yet

20  after creating a safety program to address the issue, completely failed to follow its

21  directives.  56 F.3d at 1126.  The safety program in *Faber* required the USFS to install

22  warning signs, launch a media awareness campaign, and appoint a ranger to stand near

ORDER- 14

1   the waterfall to warn of the danger. *Id.* Unfortunately the USFS did not carry out these

2   mandatory directives. Because the safety program "did not give the Forest Service the

3   option to do nothing," the court held that the government had failed to meet step one of

4   the discretionary function exception. *Id.* Here, on the other hand, the USFS did not "do

5   nothing." The USFS recognized the ice caves as dangerous and chose to install warning

6   signs in order to protect visitors, even though there was no safety program that mandated

7   this specific course of action.

8           Further, the FSM did not require the USFS to install the replacement sign before

9   G.T.'s death occurred on July 31, 2010. Although FSM 2332.1 requires the "immediate"

10  removal of "high-priority hazards," these provisions require the exercise of discretion.

11  This is true even though FSM 2332 suggests that the term "high-priority hazards" refers

12  to "health- and safety-related items." *See* FSM 2332 ("Give health and safety related

13  items highest priority"). As emphasized above, FSM 2332.1 only requires the USFS to

14  eliminate safety hazards "to the extent practicable." Under a plain reading of this

15  provision, practicability limits both the extent to which the USFS is required to eliminate

16  safety hazards and the immediacy with which the USFS must correct high-priority

17  hazards. Obviously, "immediate" cannot mean "magically instantaneous," particularly in

18  the context of wilderness management. This provision requires the USFS to determine,

19  within the confines of its many other responsibilities, how quickly to address high-

20  priority hazards. Further, even though FSM 2332 appears to define "high-priority

21  hazards" as those related to the health and safety of its visitors, this term also requires

22  discretion. First, the task of prioritizing something inherently demands an element of

1 judgment or choice. Second, virtually everything in a National Forest area could

2 theoretically qualify as a "health- and safety-related item." Thus, in essence, the entire

3 Mt. Baker-Snoqualmie national forest is, to some degree, a high-priority hazard. Under

4 FSM 2332.1, the USFS must use its discretion and policy judgment to choose which

5 items to treat as "high-priority" from among this nearly limitless category of potential

6 hazards

7       This case is similar to *Bailey v. United States*, where the court held that the

8 government retained discretion under step one to decide when to replace a warning sign.

9 623 F.3d at 861. In *Bailey*, family members of a man who drowned after his river raft

10 went over a debris-control dam sued the government alleging that the Army Corps was

11 negligent in failing to replace missing signs warning of the dam's approach. *Id.* at 859.

12 An Army Corps policy stated "that missing or damaged signs must be replaced or

13 repaired in a timely manner." *Id.* at 858. The court held that this policy was not enough

14 to mandate a specific timeframe in which the signs had to be replaced under step one of

15 the discretionary function test. *Id.* at 861. Here, although "immediately" is different than

16 "in a timely manner," both terms require the exercise of discretion, as discussed above.

17 Moreover, the policy at issue in *Bailey* did "not create a mandatory and specific directive

18 regarding when the Corps must replace any missing or damaged signs." 623 F.3d at 861.

19 Applied to FSM 2332 and 2332.1, this statement is even more true. Whereas the policy

20 in *Bailey* specifically applied to sign replacement, neither FSM 2332 nor 2332.1 even

21 mention signs—their only connection to sign replacement is an inference that a missing

22

1    sign counts as a "high-priority" hazard. Although FSM 2332.12 prompts the USFS to

2    "consider" posting warning signs, it says nothing regarding sign replacement.

3            This case is also similar to *Chadd v. United States*, where the Western District of

4    Washington recently dismissed a negligence claim under the discretionary function

5    exception. 2012 WL 3578660 at *1. In *Chadd*, the plaintiff sued the government after

6    her husband was killed by a mountain goat while on a day hike in Olympic National

7    Park. *Id.* at *4. Just like in this case, the directives in *Chadd* were broad and required the

8    exercise of discretion. In *Chadd*, there was no question that park officials were aware

9    that the mountain goat had shown signs of aggression and was a safety threat to visitors.

10   *See id.* Although park officials had taken steps to address the threat posed by the

11   mountain goat, the plaintiff argued that several park management policies had in fact

12   required officials to remove or kill the mountain goat before it attacked and killed her

13   husband. *Id.* at *5. Nevertheless, even though one policy mandated that the "saving of

14   human life will take precedence over all other management actions," the court concluded

15   that the government had satisfied step one because the policy qualified this mandate

16   repeatedly, just like the mandate at issue in this case. *Id.* at *7-8. For example, in one

17   instance, the policy provided that "[w]hen practicable . . . , the Service will reduce or

18   remove known hazards." *Id.* As the court observed, this language did not "provide a

19   timeline that must be followed." *Id.* at *8. Further, although the court agreed that

20   "further action" should have been taken to protect visitors from the aggressive mountain

21   goat, "the timing of that further action is not mandated by any of the identified policies."

22   *Id.* at *11. The same is true of FSM 2332 and 2332.1. Neither provides a specific

ORDER- 17

1    timeline for action, but leaves the timing to USFS's discretion. In this situation, the

2    discretionary function exception applies even if discretion is abused. 28 U.S.C.

3    § 2680(a).

4         The FSM provisions at issue in this case are simply not of the same type as those

5    that courts have held to provide mandatory directives. For example, in *Bolt v. United*

6    *States* a United States Army Policy required the removal of snow from a residential

7    parking lot "'once per year in late February or March'" and to generally "'insure all . . .

8    common areas are free of trash, snow and ice.'" 509 F.3d 1028, 1032 (9th Cir. 2007).

9    When a pregnant woman slipped and fell on ice in the parking lot, the court held that the

10   discretionary function exception did not immunize the government from her negligence

11   claim because the Army had failed follow the mandatory directive of keeping the parking

12   lot clear of ice. *Id.* at 1033. This is the kind of specific directive that removes all

13   discretion and makes government action mandatory.

14        Finally, other courts have held that the FSM provisions at issue here do not

15   preclude governmental discretion under step one. For example, in *Rosebush v. United*

16   *States*, the Sixth Circuit stated that "Section 2332 requires only that the Forest Service

17   prepare and annually update an 'operation and maintenance' plan which gives health and

18   safety related items the 'highest priority.'" 119 F.3d 438, 442 (6th Cir. 1997). Also, the

19   court in *Rosebush* interpreted FSM 2332.1's directive to immediately correct high-

20   priority hazards as limited by practicability. *Id.* "The plain language of the section" only

21   requires the USFS "to eliminate safety hazards from recreation sites '*to the extent*

22   *practicable.*'" *Id.* (emphasis in original). "Decisions concerning what constitutes

1   'practicable' require the exercise of discretion . . . ." *Id.* For the foregoing reasons, the

2   FSM did not mandate the installation of additional safety precautions or the replacement

3   of the warning sign before July 31, 2010.

4          In addition to the FSM, the record contains management or policy documents

5   applicable to the USFS's administration of the ice caves recreation area. The "Big 4

6   Interpretive Plan" (Mot. Ex. C) is a plan adopted by the Darrington Ranger District for

7   optimizing the public's experience at the ice caves and the surrounding area.

8   Supplementing the plan is a document titled, "Big Four Interpretive Project

9   Implementation Plan" (Mot. Ex. D). These documents provide recommendations to the

10   District about the verbiage and locations of signs warning visitors about the potential

11   dangers presented by the ice caves. (*See* Mot. Ex. C at 12; Ex. D at 20, 22.) Also in the

12   record is a copy of the "Sign and Poster Guidelines for the Forest Service" that appear on

13   the USFS's website. (Mot. Ex. B.) These guidelines require the USFS to "use warning

14   signs to alert users of known hazards that . . . are unusual, unexpected, or not readily

15   apparent to the typical visitor under conditions when use normally incurs." (*Id.* at 9.)

16   Under the maintenance objectives, "signs should be replaced when: they are damaged,

17   their poor condition has an effect on safety of the traveling public . . . [or] they no longer

18   meet applicable standards." (*See* Guidelines §16.1, *available at* http://www.fs.fed.us/t-

19   d/pubs/htmlpubs/em7100-15/page62.htm.) Further, "[i]f there is a history of repeat

20   vandalism, consider ordering replacement signs with a clear protective overlay sheeting

21   over the entire face of the sign." (*Id.* § 16.4.) Finally, in bold, yellow-highlighted text,

22   the guidelines direct the USFS to "[r]eplace nonstandard signs based on safety, priorities,

1 | and available resources." (*Id.* § 16.3.) Nonstandard signs are those that deviate from the

2 | federal guidelines for traffic signs and devices contained in the Manual on Uniform

3 | Traffic Control Devices. (Guidelines § 1.4.)

4 |       Despite Plaintiffs' arguments, these documents do not rise to the level of specific

5 | mandates directing a course of action under step one of the discretionary function

6 | exception. Both the Big 4 Interpretive Plan and the Big Four Interpretive Project

7 | Implementation Plan are recommendations by a planning committee, not required

8 | mandates. For example, the section of the Big 4 Interpretive Plan relevant to warning

9 | signs is entitled, "Recommendations for Implementation." (Mot. Ex. C at 20.)

10 | Moreover, although the Sign and Poster Guidelines provide for the replacement of

11 | damaged signs, the Guidelines also contain expressly discretionary language:

12 | "nonstandard signs [should be replaced] based on safety, priorities, and available

13 | resources." (Guidelines § 16.3.)

14 |       Finally, Plaintiffs point to statements made by Mr. Forbes, the USFS Ranger in

15 | charge of the Darrington District, as evidence of a mandatory directive. (Resp. at 15.)

16 | Asked how the USFS responds when it discovers that a warning sign has gone missing,

17 | he testified in his deposition that "[i]f it's critical to public safety, like a stop sign, for

18 | example, or in this case, the ice cave sign, sometimes we have an extra supply." (Forbes

19 | Dep. at 9.) Moreover, Mr. Forbes has stated that "as soon as we're aware of the signs are

20 | missing we replace them [sic]." (Tam Decl. Ex. A at 6.)

21 |       Nevertheless, Mr. Forbes's statement is not the sort of mandatory directive that

22 | courts analyze under step one of the discretionary function exception. To determine

1   whether the government has discretion under step one, courts look to "established

2   governmental policy, as express or implied by statute, regulation, or agency guidelines."

3   *Terbush*, 516 F.3d at 1130.

4        The Government has met its burden under step one to demonstrate the absence of

5   a mandatory directive prescribing a specific course of action.  The USFS was not

6   required by established governmental policy to implement additional safety measures or

7   to replace the missing warning sign before G.T. was killed.  As such, the conduct

8   challenged by Plaintiffs in this matter involved an element of judgment or choice on the

9   part of the USFS, and thus, was discretionary.

10        2.  <u>Step Two: Whether the Government's Discretion Is Susceptible to Policy
            Analysis</u>

11

12        If the Government carries its burden under step one to demonstrate that it had

    discretion as to the challenged conduct, the Government then must demonstrate under

13
    step two that its discretion was of the type that Congress meant to immunize from lawsuit
14
    under the discretionary function exception.  *Bailey*, 623 F.3d at 860-61.  This question
15
    turns on whether the challenged conduct was susceptible to policy analysis.  *Whisnant v.*
16
    *United States*, 400 F.3d 1177, 1182 (9th Cir. 2005).  Under Ninth Circuit law, "so long as
17
    a decision involves even two competing interests, it is 'susceptible' to policy analysis and
18
    is thus protected by the discretionary function exception."  *Bailey*, 623 F.3d at 863.
19
         The USFS's decision not to install additional signs or other safety precautions was
20
    susceptible to policy analysis because it required the balancing of concerns in addition to
21
    visitor safety, such as resource allocation, promoting visitor access, wilderness
22

1  preservation, and other factors. (Forbes Decl. at 5.) For example, in addressing the

2  USFS's decision to remove the warning sign formerly situated in the rocks outside of the

3  viewing area in front of the ice caves, Mr. Forbes explained that USFS officials

4  "determined that the sign might attract or entice visitors to leave the trail terminus to read

5  the sign . . . . [and] that placing signs in the undeveloped area may give visitors a false

6  sense that this area was somehow maintained by the FS and an acceptable and safe area

7  to be in." (*Id.* at 4.) In *Childers v. United States*, the court concluded that the National

8  Park Service's decision about how best to warn park visitors about the dangers of

9  unmaintained trails was susceptible to policy analysis. 40 F.3d 973, 976 (9th Cir. 1994).

10  Because "rangers used their discretion to balance, within the constraints of the resources

11  available to them, a statutory mandate to provide access with the goal of public safety[,]"

12  the National Park Service's "decision was precisely the kind [of decision] the

13  discretionary function exception was intended to immunize from suit." *Childers*, 40 F.3d

14  at 976.

15      The USFS's decision about when to replace the missing warning sign is a closer

16  call. As Plaintiffs point out, it is true that once the Government decides to implement

17  particular measures for promoting visitor safety, the implementation and maintenance of

18  those safety measures is not susceptible to policy analysis. *See Whisnant*, 400 F.3d at

19  1181. "[A] dominant theme in our case law is the need to distinguish between design and

20  implementation:  we have generally held that the design of a course of governmental

21  action is shielded by the discretionary function exception, whereas the implementation of

22  that course of action is not." *Id.*  In other words, "safety measures, once undertaken,

1  cannot be shortchanged in the name of policy." *Marlys Bear Med. v. U.S. ex rel. Sec'y of*

2  *Dept. of Interior*, 241 F.3d 1208, 1217 (9th Cir. 2001). It is also true, however, that

3  "[t]he implementation of a government policy *is* shielded where the implementation itself

4  implicates policy concerns . . . ." *Whisnant*, 400 F.3d at 1182 n.3 (emphasis in original).

5      The decision about when to replace the missing sign was susceptible to policy

6  analysis because the maintenance of warning signs in the ice caves area involved the

7  balancing of competing policy concerns. The Government has submitted testimony and

8  declarations from USFS employees who were directly involved in the management of the

9  ice caves recreation area during the month leading up to G.T.'s death. Mr. Forbes, for

10  example, explained that limited staffing resources prevented the USFS from installing the

11  replacement sign on the busy summer weekend of Friday, July 30, 2010 through Sunday,

12  August 1, 2010. (Forbes Decl. at 7.) In general, "FS officials must budget staffing and

13  assign duties based on available resources." *Id.* Further, Ms. Hall described weekends as

14  requiring the USFS to deal with packed campgrounds and trailheads, as well as crime

15  problems such as car break-ins and even shootings. (Mot. to Supp. Ex. A at 13.) On the

16  day the replacement sign arrived, there were 366 visitors to the ice caves area. (Mot. to

17  Supp. Ex. B at 21.) Diane Boyd, another USFS employee, testified that although it is

18  important to replace missing warning signs, USFS employees must also consider other

19  duties. (*Id.* at 8.) The two-person team charged in the summer of 2010 with patrolling

20  the area that includes the ice caves was responsible for approximately 21 trailheads,

21  dozens of camp sites, and hundreds of miles of roads and trails. (Hall Decl. at 14-15.)

22  The decisions about when to order the replacement sign and when to install the sign once

ORDER- 23

1   it arrived were susceptible to policy analysis because they required the balancing of

2   competing interests.  *See Bailey*, 623 F.3d at 863.

3          "In hindsight it may be easy to say the [USFS] . . . should have replaced the signs

4   sooner, but that is exactly the judicial second-guessing of government decision-making

5   that the discretionary function exception is designed to prevent."  *Bailey*, 623 F.3d at 863.

6   As has been the case before, "[o]ur task is not to determine whether the Forest Service

7   made the correct decision in its allocation of resources. Where the government is forced,

8   as it was here, to balance competing concerns, immunity shields the decision."  *Miller v.*

9   *United States*, 163 F.3d 591, 596 (9th Cir. 1998).

10                              **IV.    CONCLUSION**

11         The Government has carried its burden to establish that it has sovereign immunity

12  under the discretionary function exception to the FTCA.  Because the discretionary

13  function exception to the FTCA applies, the court lacks subject matter jurisdiction.

14  Accordingly, the court GRANTS the motion (Dkt. # 11.) and DISMISSES WITH

15  PREJUDICE this action pursuant to Rule 12(b)(1).

16         Dated this 26th day of October, 2012.

17

18

19                                                      JAMES L. ROBART
                                                        United States District Judge
20

21

22

ORDER- 24